IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DEBRA MCKARNIN o/b/o      )
DAVID L. MCKARNIN,        )
                          )
            Plaintiff,    )
                          )
      v.                  )    Case No. 07-0071-CV-W-REL-SSA
                          )
MICHAEL ASTRUE, Commissioner  )
of Social Security,       )
                          )
            Defendant.    )

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Debra McKarnin seeks review of the final decision of the Commissioner of Social Security denying David McKarnin's application for disability benefits under Title II of the Social Security Act ("the Act"). The ALJ found that plaintiff was disabled only from his 50th birthday through the date of his death. Plaintiff argues that the ALJ erred in (1) finding that plaintiff's combined impairments did not meet or equal a listed impairment, (2) discounting and rejecting the opinions of claimant's treating physicians and that of the ALJ's medical expert, and (3) relying on the testimony of the vocational expert which was based upon a faulty hypothetical. I find that the ALJ's decision is not supported by the substantial evidence in the record as a whole, and that plaintiff is entitled to disability benefits from his alleged onset date through his 50th birthday, the date the ALJ found plaintiff's disability began.

Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

**I.    *BACKGROUND***

On May 14, 2001, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since May 4, 2001.  Plaintiff's disability stems from an enlarged heart, diabetes, history of cancer, glaucoma, shortness of breath, and difficulty walking and climbing. Plaintiff's application was denied on July 9, 2001.  On January 23, 2003, a hearing was held before an Administrative Law Judge. On March 12, 2003, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On May 27, 2003, the Appeals Council denied plaintiff's request for review.

On July 30, 2003, plaintiff filed an action in federal court, <u>McKarnin v. Barnhart</u>, 03-0645-CV-W-JTM-SSA.  On June 8, 2004, Judge John Maughmer entered an order remanding the case for further consideration.  On July 21, 2004, the Appeals Council vacated its previous refusal to review the March 2003 decision as well as the March 2003 decision and remanded.  Upon remand the ALJ was to (1) obtain additional evidence with respect to plaintiff's physical impairments, (2) give further consideration to the treating source opinions, (3) if appropriate request the treating sources to provide additional evidence and/or further clarification of their opinions and medical source statements,

2

and (4) if necessary obtain supplemental evidence from a medical expert and vocational expert.

On January 19, 2005, a supplemental hearing was held. On June 19, 2005, plaintiff died from congestive heart failure and coronary artery disease. On July 29, 2005, a partially favorable decision was issued finding plaintiff disabled as of April 23, 2004, but not before. On November 22, 2006, the Appeals Council denied plaintiff's[1] request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera

---

[1]Plaintiff's widow, Debra McKarnin, was substituted as plaintiff. The references to "plaintiff" in the review of medical records and testimony refer to David McKarnin.

3

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion

4

shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

            Yes = not disabled.
            No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

            No = not disabled.
            Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

            Yes = disabled.
            No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

            No = not disabled.
            Yes =  go to next step where burden shifts to Com-
missioner.

5

5.   Does the impairment prevent the claimant from doing any other work?

                    Yes = disabled.
                    No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff, vocational expert Lisa Keene, and medical expert Shelbert Chernoff, M.D., in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1974 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 1,982.91 | 1990 | $23,041.09 |
| 1975 | 1,541.95 | 1991 | 24,450.12 |
| 1976 | 6,816.67 | 1992 | 24,675.99 |
| 1977 | 7,752.51 | 1993 | 29,383.11 |
| 1978 | 8,827.83 | 1994 | 26,792.24 |
| 1979 | 8,503.92 | 1995 | 26,958.81 |
| 1980 | 9,484.74 | 1996 | 26,621.68 |
| 1981 | 11,024.22 | 1997 | 27,757.60 |
| 1982 | 12,903.21 | 1998 | 28,152.31 |
| 1983 | 14,293.61 | 1999 | 29,215.56 |
| 1984 | 15,039.13 | 2000 | 30,814.16 |
| 1985 | 18,262.15 | 2001 | 13,248.89 |

6

| 1986 | 16,368.63 | 2002 | 0.00 |
|------|-----------|------|------|
| 1987 | 20,511.86 | 2003 | 0.00 |
| 1988 | 21,792.55 | 2004 | 0.00 |
| 1989 | 22,577.33 | | |

(Tr. at 375-379).

**Claimant Questionnaire**

In a claimant questionnaire completed on May 30, 2001, at the request of the agency, plaintiff reported he was unable to walk more than 100 feet without his heart pounding, becoming short of breath, his arms feeling heavy, and getting weak. To relieve the symptoms, plaintiff would sit down for 30 minutes (Tr. at 112). Plaintiff's wife cooked the meals and did the shopping. Plaintiff washed dishes and tried to help his wife cook. He showered only twice a week due to chest pain (Tr. at 113). Plaintiff was no longer able to garden. He spent part of his day, three or four times a week, visiting a friend who lived 20 miles away (Tr. at 114).

**B.     *SUMMARY OF MEDICAL RECORDS***

Plaintiff was examined on May 24, 2000, by Daniel Toubes, M.D., after complaining of a bad cough for several weeks (Tr. at 191). Plaintiff was noted to be extremely obese but had no chest pain, dyspnea (shortness of breath), orthopnea (difficulty breathing while lying down), or PND (a sudden reoccurrence of nocturnal dyspnea). Physical examination revealed a regular

7

pulse and lungs clear to auscultation and percussion. Plaintiff's heart had a regular rhythm without edema, gallop or murmur. Plaintiff was diagnosed with bronchitis and massive obesity. An Ace inhibitor was ordered for his hypertension. Plaintiff was advised to use the air conditioner in his pickup to filter out some of the pollen. Pulmonary function tests were 73 percent of normal with mild restriction of vital capacity, but no air flow obstructive change. Plaintiff was encouraged to meet with a dietician for weight reduction.

Plaintiff saw Carl Strauss, M.D., on June 26, 2000, for difficulty sleeping the last two months, although he was feeling better (Tr. at 190). He described a gasping and tightening up as he drifted off to sleep. Plaintiff had to sit up and was unable to sleep flat. He had also noted exertional dyspnea (shortness of breath on exertion) and the center of his chest hurt. He felt light-headed, nauseated, diaphoretic (experiencing profuse perspiration). It was noted that a prior chest x-ray showed mild cardiomegaly (enlargement of the heart).

Examination revealed irregular pulse and heart rhythm (Tr. at 190). There was no cardiomegaly (enlarged heart) by palpation or percussion (although an x-ray had indeed shown cardiomegaly)

and no peripheral edema[2]. An EKG showed atrial fibrillation[3] at a rate of 114. Plaintiff was diagnosed with cardiomegaly (enlarged heart) and atrial fibrillation and referred to cardiology. He was started on Coumadin, a blood thinner.

On June 30, 2000, plaintiff again saw Dr. Strauss (Tr. at 189). Plaintiff reported feeling a lot better but his heart rate was still around 110-115[4] and irregular. Plaintiff's lungs were now clear. His medications were continued, Toprol XL[5] was added, and it was noted plaintiff was scheduled to see a cardiologist on July 5, 2000.

On July 5, 2000, plaintiff was examined by William Michael Allen, M.D., of Rockhill Cardiology Group, Inc. (Tr. at 157). Plaintiff reported he had developed difficulty breathing on the medication Toprol so it was discontinued. Plaintiff also reported he had difficulty sleeping at night, felt tired most of the day, and fell asleep when he tried to read books.

---

[2]Abnormal buildup of fluid in the ankles, feet, and legs.

[3]During atrial fibrillation, the heart's two small upper chambers (the atria) quiver instead of beating effectively. Blood is not pumped completely out of them, so it may pool and clot. If a piece of a blood clot in the atria leaves the heart and becomes lodged in an artery in the brain, a stroke results.

[4]In an adult male, the average normal heart rate is 70.

[5]Toprol XL is a beta blocker used to treat stable, symptomatic patients with Class II or III heart failure, as defined by the New York Heart Association classification, that is caused by high blood pressure, blocked heart arteries, or other heart muscle disorders.

9

Plaintiff's laboratory studies were normal (Tr. at 158). A
chest x-ray demonstrated cardiomegaly (enlarged heart) without
pulmonary edema[6]. His EKG showed evidence of atrial fibrillation
(see footnote 3) and left ventricular hypertrophy[7]. Physical
examination showed an extremely obese individual with blood
pressure 160/80. The heart rhythm was quite irregular. Femoral
pulses (located in the thigh) were not palpable due to his large
legs. Pedal pulses were present and there was a trace amount of
edema (fluid build up).

Plaintiff's echocardiogram showed a dilated left ventricle
with global hypokinesis (poor function throughout the heart) with
an ejection fraction[8] of 20-25% (Tr. at 158). His left and right

---

[6]An abnormal build up of fluid in the lungs, which leads to
swelling. Pulmonary edema is usually caused by heart failure. As
the heart fails, pressure in the vein going through the lungs
starts to rise. As the pressure increases, fluid is pushed into
the air spaces (alveoli). This fluid interrupts normal oxygen
movement through the lungs, resulting in shortness of breath.

[7]Left ventricular hypertrophy refers to a thickening of the
heart muscle's main pumping chamber, the left ventricle. Although
left ventricular hypertrophy itself is not a disease, it is a
marker of an underlying health problem. The thickened muscle
usually develops in response to chronic high blood pressure or
excessive blood volume filling the left ventricle, which creates
more work for the heart. Over time, the overdeveloped heart
muscle may wear out and eventually fail. The incidence of left
ventricular hypertrophy (LVH) increases with age and is more
common in people who have high blood pressure or have other heart
problems. Whatever the cause, left ventricular hypertrophy
places a person at an increased risk of major heart and blood
vessel complications, compared with people without the condition.

[8]During each heartbeat cycle, the heart contracts and
relaxes. When the heart contracts (systole), it ejects blood

10

atria and right ventricle were enlarged.  A Doppler study showed

the presence of mild mitral valve insufficiency[9].  Tricuspid

valve insufficiency[10] was present with elevated right ventricular

_____

from the two pumping chambers (ventricles).  When the heart
relaxes (diastole), the ventricles refill with blood.  No matter
how forceful the contraction, it does not empty all of the blood
out of a ventricle.  The term "ejection fraction" refers to the
percentage of blood that is pumped out of a filled ventricle with
each heartbeat.  This measures the capacity at which the heart is
pumping.  Because the left ventricle is the heart's main pumping
chamber, ejection fraction is usually measured only in the left
ventricle (LV).  A normal LV ejection fraction is 55 percent to
70 percent.  The ejection fraction may decrease when the heart
muscle has been damaged.

[9]Mitral valve insufficiency is a term used when the valve
between the upper left chamber of the heart (atrium) and the
lower left chamber (ventricle) does not close well enough to
prevent back flow of blood when the ventricle contracts.
Normally, blood enters the left atrium of the heart from the
lungs and is pumped through the mitral valve into the left
ventricle.  The left ventricle contracts to pump the blood
forward into the aorta.  The aorta is a large artery that sends
oxygenated blood through the circulatory system to all of the
tissues in the body.  If the mitral valve is leaky due to mitral
valve insufficiency, it allows some blood to get pushed back into
the atrium.  This extra blood creates an increase in pressure in
the atrium, which then increases blood pressure in the vessels
that bring the blood from the lungs to the heart.  Increased
pressure in these vessels can result in increased fluid buildup
in the lungs.

[10]Tricuspid valve insufficiency occurs when a tricuspid
valve does not close tightly enough to prevent leakage.  The
tricuspid valve is located between the right atrium and the right
ventricle of the heart.  When the right ventricle contracts, it
is supposed to pump blood forward into the lungs.  If the
tricuspid valve does not close tightly, some of that blood leaks
back into the right atrium.  When the atrium receives its usual
quantity of blood from veins leading to the heart, plus the
leaking blood, the pressure inside the atrium increases.  This
higher pressure creates resistance to the flow of blood in the
veins that enter the atrium from the body.  In addition, this
increase in pressure causes the right atrium to enlarge over

11

systolic pressures in the range of 40-45 mmHG.

Plaintiff was diagnosed with dilated cardiomyopathy[11] complicated by atrial fibrillation[12] (Tr. at 158). It was thought that as his rate improved his cardiomyopathy might improve; however, it was also possible that plaintiff had the after affects of an alcoholic cardiomyopathy[13] considering his previous history. It was recommended that plaintiff begin the use of Cardizen and digoxin to slow down his heart rate.

Plaintiff was seen by Dr. Strauss on July 10, 2000 (Tr. at 188). Plaintiff reported that he had good days and bad days. His pulse was 120 (a normal adult pulse rate is 60 to 100) and minimally irregular. His lungs exhibited mainly dry but

---

time. Congestion from fluid buildup occurs, particularly in the liver and legs.

[11]A condition in which the heart becomes weakened and enlarged, and cannot pump blood efficiently.

[12]During atrial fibrillation, the heart's two small upper chambers (the atria) quiver instead of beating effectively. Blood is not pumped completely out of them, so it may pool and clot. If a piece of a blood clot in the atria leaves the heart and becomes lodged in an artery in the brain, a stroke results.

[13]Alcoholic cardiomyopathy is a disorder in which excessive, habitual use of alcohol weakens the heart muscle so that it cannot pump blood efficiently.

12

occasionally moist inspiratory rales[14]. No peripheral edema[15] was noted. Plaintiff's medications were adjusted and he was advised to return to the clinic in ten days.

On July 28, 2000, plaintiff reported for a follow up visit with Dr. Allen, his cardiologist (Tr. at 155). Plaintiff advised Dr. Allen that his respirations and chest discomfort had markedly improved, as had his exercise tolerance. Plaintiff continued to have an irregular rhythm, but his heart rate was much improved with a pulse rate of about 55 to 65. He had no peripheral edema. Left ventricular ejection fraction was 30-35% (see footnote 8).

Cardiac ultrasound showed a dilated left ventricle with global hypokinesis (poor function throughout the heart). Left atrium was enlarged, right atrium and ventricle were probably normal. Impression was improved left ventricular function with a slowing of the heart rate but plaintiff remained in atrial fibrillation (see footnote 12).

Plaintiff agreed to proceed with an attempt at electrical cardioversion[16]. The risks of the procedure due to plaintiff's

---

[14]A type of abnormal lung sound heard through a stethoscope. Rales may be sibilant (whistling), dry (crackling) or wet (more sloshy) depending on the amount and density of fluid refluxing back and forth in the air passages.

[15]Abnormal buildup of fluid in the ankles, feet, and legs.

[16]Electrical cardioversion is a procedure in which an electric current is used to reset the heart's rhythm back to its regular pattern. Although cardioversion can return the heart rhythm to normal, it does not act in the long term to maintain a

13

size were discussed (Tr. at 156).  On August 7, 2000, plaintiff advised Dr. Allen that he preferred not to undergo electrical cardioversion (Tr. at 154).  His heart rate was well controlled and his symptoms were markedly improved, so Dr. Allen advised that he return to Dr. Strauss for continued care.  Dr. Allen reminded plaintiff that he needed to have a pro time[17] test at least once monthly while on Coumadin (Tr. at 154).

On August 8, 2000, plaintiff met with a dietician to discuss a weight-loss plan (Tr. at 186).

On August 16, 2000, plaintiff again saw Dr. Strauss (Tr. at 186).  He reported he was on a diet and his wife was helping him.  Plaintiff had improvement since his last visit, but admitted to some exertional dyspnea (shortness of breath) and chest pain at the extremes of his exertion.  He was sleeping well through the night.

Plaintiff was assessed with dilated cardiomyopathy (see

_____

normal rhythm.  Risks of the procedure include the following: (1) A blood clot may become dislodged from the heart and cause a stroke.  This risk is decreased by the use of blood thinners or other measures. (2) The procedure may not work. Additional cardioversion or other treatment may be needed. (3) Anti-arrhythmic medications used before and after cardioversion or even the cardioversion itself may cause a life-threatening irregular heartbeat.

[17]Prothrombin time is a blood test that measures the time it takes for the liquid portion (plasma) of the blood to clot.

footnote 11), congestive heart failure[18] that was improving slowly, asthma, and morbid obesity (Tr. at 186). His heart rhythm appeared regular. There was bilateral 2+ edema[19].

Plaintiff returned to see Dr. Strauss on September 13, 2000, because he was not feeling well in general (Tr. at 185). He reported a lot of shortness of breath and was still experiencing some paroxysmal nocturnal dyspnea[20] and orthopnea[21]. He had a persistent cough for "quite a while." In addition, his heart would thump. His chest hurt "real bad" when he exerted himself excessively. The swelling in his legs was variable but more

---

[18]Congestive heart failure means that the heart is not pumping as well as it should be. The body depends on the heart's pumping action to deliver oxygen- and nutrient-rich blood to the body's cells. When the cells are nourished properly, the body can function normally. With heart failure, the weakened heart cannot supply the cells with enough blood. This results in fatigue and shortness of breath.

[19]Edema is observable swelling from fluid accumulation in body tissues. Pitting edema can be demonstrated by applying pressure to the swollen area by depressing the skin with a finger. If the pressing causes an indentation that persists for some time after the release of the pressure, the edema is referred to as pitting edema. Any form of pressure, such as from the elastic in socks, can induce pitting with this type of edema. In non-pitting edema, which usually affects the legs or arms, pressure that is applied to the skin does not result in a persistent indentation. Non-pitting edema of the legs is difficult to treat. Diuretic medications are generally not effective, although elevation of the legs periodically during the day and compressive devices may reduce the swelling.

[20]Waking at night short of breath, difficulty breathing while lying down.

[21]The inability to breathe easily unless one is sitting up straight or standing erect.

noticeable in the left lower extremity and there was a sore that had been weeping when the swelling increased.

Examination revealed a slightly irregular heart rhythm and massive swelling of the lower extremities, which "pits poorly" (Tr. at 185). There were several round lesions on plaintiff's legs. His cough was thought possibly attributable to his Ace inhibitor. His congestive heart failure was chronic, but improved. It was difficult to tell whether the congestive heart failure had worsened or he felt bad because of the Ace inhibitor. A Doppler ultrasound was ordered of plaintiff's lower extremities and he was advised to discontinue two medications.

Plaintiff saw Jason Kimball, M.D., on September 20, 2000 (Tr. at 184). Plaintiff had been taken off his Ace inhibitor as it was felt to be worsening his peripheral edema. Plaintiff stated he had shortness of breath on exertion at about 50 feet. Blood pressure was 158/68 and on recheck 154/70. His heart had an irregular rhythm and there was 1+ edema of his extremities.

Plaintiff was advised to limit his fluid intake. He was thought to have five to ten pounds of excess fluid weight and he was started on Lasix (a diuretic) and potassium chloride. Plaintiff was in fair pulmonary condition but understood obstructive sleep apnea (complete obstruction of the airway) would be an issue if he did not lose weight soon (Tr. at 184). Plaintiff's weight was over 350 pounds, but he was unable to

16

weigh himself daily because he was too overweight.

On September 27, 2000, plaintiff reported to Dr. Kimball he was better after instituting the new medications (Tr. at 183). He felt he was not having any dyspnea on exertion or at night. Plaintiff continued to have an irregular heart beat and there was 2+ pitting edema up to his knees.

On October 18, 2000, plaintiff informed Dr. Kimball he had been experiencing exertional chest pain for months without radiation, shortness of breath or nausea (Tr. at 182). The chest pain went away after five minutes of rest, but often came on while he was showering. Examination showed plaintiff had 1+ edema, mainly in his lower legs. It was decided to refer plaintiff to his cardiologist for a stress test. Plaintiff reported he was trying to work on his weight.

A letter from Robert L. Herman, M.D., of the Rockhill Cardiology Group dated November 13, 2000, advised Dr. Kimball that due to plaintiff weighing in excess of 350 pounds, which was beyond the weight limit of their treadmill, he had been referred for Adenosine Cardiolite study[22] (Tr. at 153).

Plaintiff underwent a myocardial perfusion scan at rest[23]

_____

[22]A medication is administered which makes the heart beat quickly, simulating exercise. No treadmill is used.

[23]A myocardial perfusion scan is a type of nuclear medicine procedure. A tiny amount of a radioactive substance, called a radionuclide, is used during the procedure to assist in the examination of the tissue under study. Specifically, the

17

with adenosine infusion[24].  He developed shortness of breath, chest pressure, and throat pressure during the infusion.  The study showed the presence of a persistent defect in the apex of the left ventricle, due either to previous infarction[25] or attenuation artifact[26] (Tr. at 142, 144-47, 161).

Plaintiff was seen on January 9, 2001, by Dr. Kimball for newly diagnosed type II diabetes (Tr. at 180).  Plaintiff had no chest pain or shortness of breath and felt unchanged except for general fatigue due to high blood sugars.  There was 1+ pitting edema.  It was noted that treating plaintiff's obesity was very difficult due to his arthritic changes and dilated cardiomyopathy

---

myocardial perfusion scan evaluates the heart's function and blood flow.  A radionuclide is a radioactive substance used as a "tracer," which means it travels through the blood stream and is taken up (absorbed) by the healthy heart muscle tissue.  On the scan, the areas where the radionuclide has been absorbed will show up differently than the areas that do not absorb it (due to decreased blood flow to the area or possible damage to the tissue from decreased or blocked blood flow).  A resting myocardial perfusion scan is used to assess the blood flow to the heart muscle (myocardium) and to determine what areas of the myocardium have decreased blood flow.

[24]Adenosine makes the coronary arteries dilate.  It can help to identify areas of heart damage by what is known as stress imaging.  Adenosine is used with another substance called thallium-201 for this test. Adenosine is for use in patients who are unable to exercise enough to make the arteries dilate.

[25]The formation of an area of dead tissue resulting from obstruction of circulation to the area, most commonly by a thrombus (blood clot within a blood vessel or the heart) or embolus (blood clot blocking a blood vessel).

[26]Artifacts degrade image quality and increase the risk of misinterpretation of the results.

18

(see footnote 11), which prevented exercise.

On January 23, 2001, plaintiff returned to see Dr. Kimball for continued monitoring of his recently diagnosed diabetic condition (Tr. at 179). Plaintiff reported feeling a little bit better overall. At his February 2001 office visit, plaintiff advised Dr. Kimball he felt as though he were losing some weight as he had to add a couple of notches to his belt. He was still having fatigue and some blurred vision, but it had improved greatly (Tr. at 178).

Plaintiff was seen at the Sabates Eye Centers on March 19, 2001, for blurred vision, off and on for the past two to three months, and past irritation (Tr. at 228). He reported no pain, flashes, or spots, but he did experience floaters[27] in both eyes.

Plaintiff returned to the Sabates Eye Centers on March 30, 2001, and was evaluated by Rohit Krishna, M.D., for increased intraocular pressure[28] and possible glaucoma[29] (Tr. at 173). Best corrected visual acuity was 20/25 in both eyes. Impression was suspicion of glaucoma, non-insulin-dependent diabetes and mild

---

[27]Floaters are tiny clumps of gel or cells inside the vitreous, the clear jelly-like fluid that fills the inside of the eye.

[28]Pressure inside the eyeball. If the intraocular pressure is elevated, it can damage the optic nerve.

[29]Glaucoma is not just one disease, but a group of them. The common feature of these diseases is damage to the optic nerve, usually accompanied by an abnormally high pressure inside the eyeball.

19

asthma.  Plaintiff was to return in one month for additional testing (Tr. at 173).  Visual field testing on April 27, 2001, was normal and plaintiff was advised to return in six months (Tr. at 215-218).

A letter dated April 17, 2001, from Dr. Herman stated he had examined plaintiff that day and plaintiff had significant medical and cardiovascular problems and should be considered for medical disability (Tr. at 152).

In a letter to Dr. Kimball, also dated April 17, 2001, Dr. Herman reported plaintiff was seen for complaints of chest burning with exertion (Tr. at 151).  On examination his heart had a regular rate and rhythm and his lungs were clear.  Plaintiff had chronic stasis edema, however.  Dr. Herman was asked about disability and he noted plaintiff did have evidence of a cardiomyopathy (see footnote 11) by echocardiogram, which would be a consideration particularly in view of his other multiple medical problems.

Plaintiff saw Dr. Kimball in follow up on April 20, 2001 (Tr. at 177).  Plaintiff reported no chest pain or pressure or shortness of breath, but he was distressed by the fact that his job position would be terminated and he would have to return to the field in a job too strenuous for his cardiac condition and his diabetes.  Plaintiff's heart had a regular rate and rhythm.  There was trace to 1+ edema bilaterally.  Plaintiff reported he

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 20 of 57

had lost some weight, and he was to continue working on his weight loss program.

In a note dated April 20, 2001, Dr. Kimball wrote that he had evaluated plaintiff and had treated him for the past eight months (Tr. at 163). According to Dr. Kimball, plaintiff, due to his cardiac and diabetic disease, was a candidate for disability.

May 4, 2001, is plaintiff's alleged onset date.

Plaintiff was seen by Dr. Kimball in follow up on July 3, 2001 (Tr. at 245). Plaintiff advised his blood sugar ranged between 51 and 155 as he had been more active with his daughter and her cousin and had not been eating quite regularly. His weight remained in excess of 350 pounds. It was noted plaintiff "has indeed fatigue at this time but also has noted presyncope (lightheadedness) with increased activity and increased sweating during the summer months" without chest pain.

Cardiovascular exam showed a regular rate and rhythm with a II/VI holosystolic murmur[30] (Tr. at 245). Dr. Kimball was surprised plaintiff was in regular rhythm. There was no pitting edema, but trace to 1+ nonpitting edema (see footnote 19).

---

[30]II-VI is the level of intensity of the murmur, it is a low intensity murmur audible after a few seconds of auscultation (listening). A holosystolic murmur is one that occupies the entire systolic interval, from first to second heart sounds. The first heart sound occurs with ventricular systole and is mainly produced by closure of the atrioventricular valves. The second heart sound signifies the beginning of diastole and is due to closure of the semilunar valves.

Plaintiff was to continue on his current regimen of medications but his Lasix and potassium would be held on days when he was expected to be more active to prevent presyncope (lightheadedness).

On September 19, 2001, plaintiff saw Dr. Kimball for medical management (Tr. at 244). Cardiovascular exam again showed a regular heart rate and rhythm, "amazingly" according to Dr. Kimball. There was trace pitting edema and 1-2+ edema otherwise nonpitting.

On October 19, 2001, plaintiff was again seen at the Sabates Eye Centers to monitor vision changes (Tr. at 212-213). He advised when he was in the sun his vision became blurry and when he went inside it took a long time for his eyes to adjust. Visual fields were full and plaintiff's condition was described as stable.

On January 8, 2002, plaintiff reported to Dr. Kimball he had experienced episodes of chest pain, relieved by nitroglycerin (Tr. at 243). He had also had several episodes of anterior chest pain radiating toward his back that was not positional or exertional. Cardiovascular exam showed a regular rate. A chest x-ray was obtained which showed no abnormalities, except for his "impressive cardiomegaly [enlarged heart]." An EKG showed no new ischemic changes. Dr. Kimball felt plaintiff's chest pain was most likely cardiac in nature. If plaintiff could get his weight

22

down, the cardiologist could evaluate him again.

A form for continuing disability benefits dated January 16, 2002, completed by Dr. Kimball, indicated plaintiff suffered congestive heart failure due to dilated cardiomyopathy (see footnote 11) and that he was unable to return to his former profession as his condition was permanent (Tr. at 242).

Plaintiff's vision was checked on April 12, 2002, at the Sabates Eye Centers in follow up for suspected glaucoma (Tr. at 208-209). Plaintiff reported no changes since his last visit except he used sunglasses more when outside. He did experience flashes of light intermittently and floaters as before. The exam showed a questionable visual field defect.

On May 1, 2002, plaintiff reported to Dr. Kimball that he was having shortness of breath at rest, which was relieved by his Proventil inhaler (Tr. at 240, 249). Plaintiff also had persistent shortness of breath on exertion. Lower extremity swelling was "at bay." Plaintiff's weight was still over 350 pounds, but down significantly as he reported he had to drill holes in his belt to make it tighter. Cardiovascular exam evidenced irregular rhythm. Plaintiff's digoxin[31] level was checked and found to be in range.

---

[31]A medication used to treat atrial fibrillation.

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 23 of 57

It was noted that plaintiff's paresthesias[32] in his feet was greater than his hands, which caused Dr. Kimball to wonder if plaintiff's blood sugars were higher than he described (Tr. at 240). Dr. Kimball thought plaintiff's shortness of breath was due to allergic rhinitis (hay fever) and mild intermittent asthma and planned to treat these conditions with inhalers and Allegra. Plaintiff was treated on May 30, 2002, for acute sinusitis (Tr. at 239). His cardiovascular exam showed a regular heart rate and rhythm.

On September 5, 2002, plaintiff was seen by Elliott L. Franks, M.D., a member of Dr. Kimball's medical group, as plaintiff needed a new physician (Tr. at 238). Plaintiff reported he had swollen feet and it hurt to walk. Heart was regular without murmur or gallop and no edema was detected. Plaintiff's medications were continued and plaintiff was to return no later than three months.

Plaintiff's vision was evaluated on October 11, 2002 (Tr. at 206-207). He reported increased floaters and light sensitivity. He also reported general fatigue. Glaucoma follow-up was stable, although there was an increase in intraocular pressure from 15 to

---

[32]Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching ("pins and needles").

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 24 of 57

19 mmHG (right eye) and to 18 (left eye), according to tonometry readings[33].

On January 6, 2003, plaintiff saw Michael Dahl, M.D., for management of his multiple medical conditions, including a history of hypertension, diabetes, atrial fibrillation, asthma, cardiomyopathy with a history of congestive heart failure, history of peripheral neuropathy[34], most likely diabetic and chronic renal insufficiency[35] (Tr. at 415). His weight was listed as 381 pounds.

Dr. Dahl noted plaintiff had lab work in September 2003

---

[33]Tonometry measures intraocular pressure to assist in the diagnosis of glaucoma. Abnormally high intraocular pressure is called ocular hypertension and is a diagnosis generally given when intraocular pressure exceeds 21 mmHG.

[34]Peripheral neuropathy describes damage to the peripheral nervous system, which transmits information from the brain and spinal cord to every other part of the body.

[35]Renal insufficiency, also called renal failure, is when the kidneys no longer have enough kidney function to maintain a normal state of health.

which showed elevation in creatinine[36] and a hemoglobin A1C[37] of 6.9 but his other chemistries fairly stable (Tr. at 415). Plaintiff informed Dr. Dahl he suffered progressive daytime somnolence (sleepiness) and was advised being morbidly obese placed him at a high risk of sleep apnea with complications if left untreated.

Dr. Dahl was asked to complete a disability form but felt he was not capable of completing the forms as this was his first visit with plaintiff, and he referred plaintiff to the State of Missouri for a permanent disability evaluation (Tr. at 415). On exam Dr. Dahl found numbness and tingling in plaintiff's feet and up to his mid calf bilaterally and in both hands. Blood pressure

---

[36]Creatinine is a chemical waste molecule that is generated from muscle metabolism. Creatinine is produced from creatine, a molecule of major importance for energy production in muscles. Creatinine is transported through the bloodstream to the kidneys. The kidneys filter out most of the creatinine and dispose of it in the urine. The kidneys maintain the blood creatinine in a normal range. Creatinine has been found to be a fairly reliable indicator of kidney function. As the kidneys become impaired the creatinine level in the blood will rise. Abnormally high levels of creatinine thus warn of possible malfunction or failure of the kidneys, sometimes even before a patient reports any symptoms.

[37] The red blood cells that circulate in the body live for about three months before they die off. When glucose sticks to these cells, it gives the doctor an idea of how much glucose has been around for the preceding three months. In most labs, the normal range is 4-5.9%. In poorly controlled diabetes, its 8.0% or above, and in well controlled patients it is less than 7.0%. The benefits of measuring A1c is that is gives a more reasonable view of what is happening over the course of time (three months), and the value does not bounce as much as finger stick blood sugar measurements.

was minimally elevated and an irregular heart rhythm was detected with the rate of about 75 but overall Dr. Dahl believed the rhythm was regular. Plaintiff's extremities showed trace ankle edema bilaterally with some nonpitting edema and diminished distal pulses. There was back tenderness, and back pain augmented plaintiff's gait.

It was Dr. Dahl's conclusion that plaintiff's atrial fibrillation was currently rate controlled although plaintiff had skipped beats, his congestive heart failure was well compensated by diuretics, and his diabetes was stable. As for plaintiff's other conditions, Dr. Dahl ordered a metabolic panel to recheck plaintiff's renal insufficiency and he recommended a sleep study to further evaluate plaintiff's suspected sleep apnea, but plaintiff deferred. Dr. Dahl assessed sleep apnea without a sleep study: "I believe that his symptoms are consistent with sleep apnea with his weight. He has a typical picture of sleep apnea patient." A pro time (see footnote 17) was also ordered to adjust his anticoagulant medication, as well as thyroid studies relative to the sleep apnea. Plaintiff was offered amitriptyline (an antidepressant) to help with his neuropathy but plaintiff declined.

Lab studies dated January 7, 2003, reflect Hemoglobin A1C at 6.9 (normal was noted as 3.0 to 6.0), BUN at 27 (normal was noted as less than 23), and creatinine at 1.8 (normal was noted as less

27

than 1.5).  His pro time was 4.8 (normal was listed as 2.0 to 3.0) (Tr. at 427).

On January 15, 2003, Dr. Franks examined plaintiff who advised he could only walk one block before his feet started to swell and he became short of breath (Exhibit 12F/21[38]). Plaintiff experienced chest pain two to three times per week which was helped by rest and nitroglycerin.  These symptoms had been going on for some time.  Plaintiff had no problem sitting, but when he did, he fell asleep.  Plaintiff's Coumadin (anticoagulant) had been recently adjusted by Dr. Dahl.

Dr. Franks noted plaintiff's irregular heart beat and his 1+ edema of his ankles with an ulcer on his left anterior thigh, described as not infected, but slightly more than superficial (Tr. at 415).  He diagnosed cardiomyopathy with congestive heart failure, atrial fibrillation, diabetes mellitus type 2, under adequate control, renal insufficiency and sleep apnea.  A prescription was given for treatment of the ulcer.

Dr. Franks also completed a form entitled "Physical Capacities Evaluation" in which he noted that plaintiff was capable of sitting for eight hours with rests that would allow him to leave his work stations (Tr. at 260).  He could stand one hour during an eight-hour day and could walk one block.

---

[38]This page is not numbered in the transcript, but is located between pages 414 and 415.

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 28 of 57

Plaintiff could occasionally lift or carry up to 25 pounds and frequently lift or carry up to ten pounds.

Plaintiff could occasionally bend, according to Dr. Franks, but should never stoop, squat, kneel, or climb stairs (Tr. at 261). He could occasionally reach above his shoulders and walk on uneven surfaces. It was medically reasonable, due to plaintiff's edema, that he would need to elevate his feet frequently to at least waist height to relieve pain and swelling.

It was also medically reasonable that the combination of plaintiff's impairments, as well as medication side effects, would result in drowsiness, frequent inattentiveness, and a need to lie down several times throughout the day at unpredictable times (Tr. at 261). It was noted that plaintiff had angina (chest pain) two to three times per week with ordinary physical activity. The combination of plaintiff's physical conditions would prevent the performance of gainful activity, per Dr. Franks (Tr. at 262).

Plaintiff was seen by Dr. Franks on January 28, 2003, for evaluation of the ulcer on his left leg, which had healed (Tr. at 414). He reported no more shortness of breath than usual and no chest pain.

On February 26, 2003, plaintiff was doing well with his medication Coumadin reporting no palpitations at his visit with Dr. Dahl (Tr. at 413). His diabetes and hypertension were listed

29

as stable (Tr. at 413).

Plaintiff was seen in follow up on May 6, 2003, and was prescribed Allegra for an aggravation of his breathing difficulties (Tr. at 411). Lab work showed the following out of range: BUN[39], creatinine, Albumin[40], Globulin[41], A/G[42], HDL Cholesterol[43], and Pro time (Tr. at 424).

Plaintiff had one more visit with Dr. Dahl in October 2003 in follow up of his anticoagulation therapy and to investigate a

---

[39]BUN stands for blood urea nitrogen. Urea nitrogen is what forms when protein breaks down. The BUN test is often done to check kidney function.

[40]Albumin is the protein of the highest concentration in plasma. Albumin transports many small molecules in the blood (for example, bilirubin, calcium, progesterone, and drugs). It is also of prime importance keeping the fluid from the blood from leaking out into the tissues.

[41]Blood is made up of red blood cells, white blood cells, and a liquid called plasma. Plasma is made of serum and clotting proteins. Serum proteins include albumin (the main protein) and globulins.

[42]Albumin/Globulin ratio. This test is ordered to provide general information about nutritional status, to provide information if the patient has symptoms that suggest a liver or kidney disorder, or to investigate the cause of abnormal pooling of fluid in tissue (edema).

[43]Cholesterol travels in the blood in particles called lipoproteins. Three of the common lipoproteins are low-density lipoproteins (LDL), high-density lipoproteins (HDL), and very low density lipoproteins (VLDL). Medical studies have shown that elevated levels of LDL cholesterol are associated with an increased risk of developing blockages in the coronary arteries, whereas elevated levels of HDL cholesterol reduce that risk. Thus, doctors sometimes refer to LDL as "bad cholesterol" and to HDL as "good cholesterol."

30

suspicious breast mass (Tr. at 409). A mammogram performed
October 7, 2003, showed no malignancy (Tr. at 430-431).

On February 9, 2004, plaintiff reported his kidneys hurt and
his feet were swelling with some redness (Tr. at 421). Lab
results showed uric acid of 12.2 mg/dl (normal is 2.7 to 8.2) and
a Westergren sed rate[44] of 140 mm/hr (normal is ≤ 11). Leukocyte
Esterase[45] was reported as 3+ (should be negative) and his white
blood cell count was 10-20 HPF (should be ≤ 5). His urine was
described as cloudy.

On February 19, 2004, plaintiff was seen for acute jaw pain
for which he was prescribed Augmentin (antibiotic) (Tr. at 406).
Plaintiff called Dr. Dahl's office on March 15, 2004, to report
his jaw was again infected and additional antibiotics were
ordered (Tr. at 405).

On April 23, 2003, according to the ALJ, plaintiff became
disabled. This was his 50th birthday.

Plaintiff was seen by Lawrence Mandel, M.D, on May 12, 2004,
for symptoms consistent with peripheral neuropathy (see footnote
34) (Tr. at 385). A good dorsalis pedis pulse[46] was obtained,
but Dr. Mandel could not palpate plaintiff's posterior tibial

---

[44]Measures inflammation in the body.

[45]Leukocyte Esterase is a urine test to look for white blood
cells and other signs associated with infection.

[46]The pulse in the blood vessel of the lower leg that
carries oxygenated blood to the dorsal surface of the foot.

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 31 of 57

pulse[47].  Dr. Mandel recommended Nortriptyline (an

antidepressant), but planned to discuss further following the

results of the arterial dopplers he ordered.

On May 21, 2004, plaintiff had a bilateral lower extremity

arterial sonogram which showed noncritical stenosis (narrowing)

in the common and both superficial femoral artery (main artery in

the thigh) (Tr. at 386).  There was adequate distal perfusion at

rest.  It was noted plaintiff had systolic hypertension.

On August 2, 2004, plaintiff reported dizzy spells,

shortness of breath, and shakes (Tr. at 403).  There was trace

hand and ankle edema (Tr. at 402).  Lab results of August 3,

2004, showed sodium, potassium, glucose, BUN (see footnote 39),

creatinine (see footnote 36), total protein (see footnote 42,

A/G), albumin (see footnote 40), globulin (see footnote 41),

HGB[48], HCT[49], RBC[50], RDW[51], and lymphocytes[52] all out of range (Tr.

───────────────

[47]The pulse located in the artery of the lower leg that
carries blood to the posterior compartment of the leg and plantar
surface of the foot.

[48]Hemoglobin is a protein in red blood cells that carries
oxygen.

[49]Hematocrit is a blood test that measures the number of red
blood cells and the size of red blood cells.  It gives a
percentage of red blood cells found in whole blood.

[50]Red Blood Cell count.

[51]Red cell distribution width (RDW) is a calculation of the
variation in the size of the red blood cells.

[52]A type of white blood cell.

32

at 419).  Repeat lab studies of August 11, 2004, remained abnormal (Tr. at 417).  Plaintiff was directed to discontinue his diuretics and was seen again on August 19, 2004 (Tr. at 399, 401).  A renal evaluation was considered (Tr. at 401).

Plaintiff was evaluated at Kidney Associates on August 27, 2004, for his complaints of dizziness and shaking and abnormal kidney lab values (Tr. at 438-439).  On September 1, 2004, plaintiff underwent a renal scan which showed gallstones and significant post void residual within the bladder with bilateral hydronephrosis[53] and dilated proximal ureters (Tr. at 448).  On September 2, 2004, plaintiff was admitted to the hospital for evaluation of renal insufficiency, hydronephrosis[54], and difficulties urinating (Tr. at 396, 449-499).

While hospitalized, plaintiff underwent a consultation with Timothy K. Neufeld, M.D., on September 3, 2004, who assessed renal failure (see footnote 35) (Tr. at 435-436, 462-463).  He noted plaintiff had gross hematuria (blood in the urine), post meatal stricture repair with placement of a Foley catheter and abnormal serum protein electrophoresis, as well as recent anemia, diabetes, hypertension, and atrial fibrillation.

---

[53]Distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter.

[54]Hydronephrosis is distention and dilation of the renal pelvis, usually caused by obstruction of the free flow of urine from the kidney.

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 33 of 57

Plaintiff also underwent a consultation with William T. Stephenson, M.D., who evaluated him for anemia and hematuria (Tr. at 459-461). Dr. Stephenson concluded plaintiff's anemia was likely multifactoral. He ordered testing to further diagnose plaintiff's conditions and indicated transfusion and bone marrow biopsy were considerations.

Plaintiff was discharged on September 8, 2004, with final diagnoses of acute and chronic renal failure, diabetes, and urinary retention (Tr. at 452). It was noted that plaintiff's creatinine levels and anemia improved following a blood transfusion. There was no evidence of myeloma (cancer of the bone marrow) and it was felt that renal insufficiency was due to diabetes and nephropathy[55]. The acute failure of his kidneys was due to obstructive uropathy.

On September 10, 2004, plaintiff underwent a consultative examination with Dr. Franks at the request of the state disability determination agency (Tr. at 388). According to Dr. Franks, plaintiff was mostly limited by chest pain, occurring, according to plaintiff, after walking 30 feet. Plaintiff treated his chest pain by taking nitroglycerin and resting. Plaintiff slept on three pillows and had a history of dilated cardiomyopathy and congestive heart failure. Plaintiff also reported he had kidney problems and was anemic, but Dr. Franks

---

[55]Damage to or disease of the kidney.

34

had no records to review regarding these conditions.

Plaintiff also reported his knees hurt; he had diabetes; he could not lift more than ten pounds; and he did not smoke, drink alcohol, or take illicit drugs (Tr. at 389). Plaintiff was found to be morbidly obese at 5' 10" and 345 pounds. His heart rhythm was described as "irregularly irregular . . . without murmur or gallop." Range of motion was normal, as were strength, sensation, reflexes, heel-toe walking, gait, and station.

Diagnoses were dilated cardiomyopathy with significant angina (chest pain), atrial fibrillation, diabetes mellitus type 2, and morbid obesity (Tr. at 389-390). It was the opinion of Dr. Franks that plaintiff did not "appear to have any work related disability. However, because of his history of angina with minimal exertion, he may not be a candidate for full time work."

Dr. Franks also completed a Medical Source Statement Physical in which he found plaintiff to be limited to lifting and carrying 20 pounds occasionally and less than ten pounds frequently (Tr. at 391-394). He found that plaintiff could stand or walk for less than two hours and he could sit without limitation. His ability to push and pull was affected by chest pain with minimal exertion. Dr. Franks found that due to chest pain plaintiff could only occasionally climb, balance, kneel, crouch, crawl, or stoop. He found that plaintiff had an

35

unlimited ability to reach, handle, finger, and feel. He should have limited exposure to temperature extremes, humidity, wetness, hazards, fumes, odors, chemicals, and gases due to chest pain.

On June 19, 2005, plaintiff died of congestive heart failure and coronary artery disease (Tr. at 381).

**C.**    ***SUMMARY OF TESTIMONY***

During the January 23, 2003, hearing, plaintiff testified; and Lynn I. DeMarco, a medical expert, and Richard Sherman, Ph.D., a vocational expert, testified at the request of the ALJ. During the January 19, 2005, hearing, plaintiff testified; and Shelbert Chernoff, M.D., a medical expert, and Lisa Keene, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony from the first administrative hearing.**

Plaintiff was born in 1954 and at the time of the first hearing was 48 years of age (Tr. at 28). Plaintiff had a high school education. He last worked on May 4, 2001, as a foreman leader for the Kansas City Public Works Street Department. He worked in this capacity for 26 years (Tr. at 28).

Plaintiff testified that he stopped working because he was missing a lot of work and feeling sick and fatigued all the time (Tr. at 28). Plaintiff did not qualify for retirement benefits, but he did have retirement savings which he was required to withdraw the previous year to pay bills (Tr. at 29).

36

Plaintiff testified he suffered chest pain when he took a shower or sometimes when he walked through his house. He had chest pain two or three times per week (Tr. at 29). Occasionally he went shopping with his wife and would usually have to find a place to sit down because his chest was hurting (Tr. at 29-30).

To alleviate the chest pain, plaintiff sat down and put his feet up for 15 minutes or so. if that did not work, he took Nitroglycerin, which was effective in relieving his pain (Tr. at 30). Plaintiff estimated he had used Nitroglycerin ten times or so in the last six months (Tr. at 30).

Plaintiff testified he developed chest and leg pain halfway through his shower. Usually he had to dry himself sitting on the bed so he could relive the pain. Because of the pain he experienced while showering, plaintiff only showered about once a week (Tr. at 30).

Plaintiff became fatigued and dizzy sometimes while walking through his house. A small amount of exertion caused fatigue (Tr. at 31). When shopping occasionally with his wife, he would have to find a place to sit down due to dizziness. He typically used a cart to hang on to while walking in the store (Tr. at 32).

Plaintiff testified he was 5'9" tall and weighed 381 pounds. He estimated that he had weighed as much as 400 pounds. Plaintiff had recently weighed himself on a scale at the hospital. Previously he had been unable to determine his weight

37

because the scales at his doctor's office only measured to 350 pounds (Tr. at 31).

Plaintiff could feel his heart pounding irregularly when he exerted himself (Tr. at 33). Plaintiff also testified he had difficulty sleeping at night, waking three to four times to use the restroom. He slept on three pillows so that he could breathe (Tr. at 45). Plaintiff did not feel rested when he awoke and suffered from daytime sleepiness, falling asleep two to three times a day from 15 minutes to a couple of hours (Tr. at 46).

Plaintiff testified he had swelling from his shins to his feet. It occurred all the time and for that reason he sat in his recliner so that he could elevate his legs. As soon as his legs came down they would start to swell and hurt. Plaintiff testified that, "Right now my feet feel like they're ready to blow up in my shoes." (Tr. at 46).

Plaintiff testified he had sores on both ankles and on his left shin. He was taking an antibiotic for the one on his leg because it had become infected. Plaintiff had been told his diabetes caused the sores. Plaintiff felt his diabetes was under control and he followed his diabetic diet (Tr. at 47).

Plaintiff testified his numerous medications caused drowsiness and fatigue, constipation and dizziness. Plaintiff was advised by his physician that his need to use the restroom at night was due to the fluid build up in his legs, which flowed to

his kidneys when he lay down at night (Tr. at 47).

Plaintiff's feet and legs hurt from just walking around the house. Climbing stairs caused plaintiff to become short of breath and caused his chest to hurt. Plaintiff had good days and bad days. On a bad day, which occurred two to three times per week, he experienced fatigue and chest pain and woke up feeling bad (Tr. at 48).

Plaintiff testified he lived with his wife and daughter. He occasionally fixed dinner, but he did no vacuuming, laundry, or yard work. He usually spent his days watching television, reading or petting the dog. Plaintiff tended to fall asleep while watching television or reading, although he tried unsuccessfully to force himself to stay awake (Tr. at 49).

Plaintiff occasionally left his home to shop with his wife or to visit his former workplace. His difficulties started about a year before he stopped working. According to his work records, plaintiff took 450 hours of sick leave and vacation time between May 2000 and May 2001. Plaintiff testified he used that time because he was sick and to see doctors. He had not taken a vacation in six years (Tr. at 50).

## 2. Plaintiff's testimony during the second administrative hearing.

Plaintiff testified that he stopped work on May 4, 2001, due to chest pains, shortness of breath, and pain and welling in his

39

feet and legs.  He also noted he had missed a lot of work.
Plaintiff stated he was a working supervisor for the Public Works
Department where he had worked for 26 years (Tr. at 309, 312).
He stated he could not perform a sedentary job because he needed
to keep his feet elevated to reduce swelling.  He was unsure what
caused the swelling.  He testified his legs would hurt and go
numb, which he believed was caused by his diabetes (Tr. at 310).

Plaintiff testified he used medications for diabetes and
asthma, which had developed three or four years earlier.  He
recalled his heart condition had been a long-time problem,
probably dating back to 2000 (Tr. at 310-311).  Prior to this
time he had not had many health problems, other than his
arrhythmic heart (Tr. at 312).  Since he stopped working, his
conditions had worsened (Tr. at 313).

Plaintiff was hospitalized recently for kidney failure and
now had to catheterize himself.  He started having kidney
problems two or three years ago as a result of his diabetes (Tr.
at 313).  Plaintiff also testified his fingers and hands were
numb from the diabetes and he was unable to check his pulse
because he had no feeling in his fingers (Tr. at 214).

Plaintiff testified his former employer allowed him to work
in the office because of his health problems.  According to
plaintiff, he worked in the office a couple of days a week as he
was "still getting worse, still missing days and that, and they

40

were making it as easy as possible for me." (Tr. at 315).

Plaintiff testified he was no longer taking diuretics because of his kidney condition (Tr. at 315).  He was taking blood pressure medication and blood thinners and used the medication Cardizem as needed for gout.  He testified his big toes hurt all the time even though his feet and legs were numb. He also had swelling on the side of and bottom of his foot (Tr. at 316-317).

Plaintiff testified he had numbness in his legs, feet, and hands; and his hands were swollen due to the diabetes.  This condition had been going on since plaintiff found out he had diabetes (Tr. at 317).  Plaintiff did not remember exactly when he started taking diabetic medication, but he believed it was prior to the time he stopped working (Tr. at 319).

Plaintiff testified he spent his days in a recliner watching television and reading until he fell asleep.  He testified he cooked occasionally, but his wife and daughter did the shopping, cooking, laundry and housecleaning (Tr. at 326).

3.   **Medical Expert testimony.**

Medical expert Shelbert Chernoff, M.D., testified at the request of the Administrative Law Judge.  Dr. Chernoff was asked to testify regarding his assessment of plaintiff's significant medical conditions dating back to May 1, 2001 -- plaintiff's alleged onset date of disability (Tr. at 289-290).

41

According to Dr. Chernoff, plaintiff had a history of testicular cancer, dilated cardiomyopathy with congestive heart failure and atrial fibrillation, which required continuous anticoagulation (Tr. at 292-293). In addition he was massively obese with a body mass index of 50[56] and had diabetes, first diagnosed in January 2001 (Tr. at 290, 291).

According to Dr. Chernoff, plaintiff was unable to undergo a cardiac stress test due to his obesity. After his heart condition, which was discovered in July 2000, was treated, his second echocardiogram was "slightly better" and his ejection fraction appeared to be "somewhat improved." (Tr. at 291). CAT scans of his chest, abdomen and pelvis showed no signs of testicular cancer three years out (Tr. at 291).

Dr. Chernoff explained that once atrial fibrillation develops, the heart can be electrically converted to a normal sinus rhythm, but successfully maintaining cardioversion is very difficult and whatever caused the fibrillation generally makes it happen again. Plaintiff declined cardioversion and as a result had to be on anticoagulant medication in order to prevent the formation of clots. Congestive heart failure was described as decreased heart output causing build up of fluid and congestion

---

[56]Plaintiff was 5'10" tall and weighed in excess of 350 pounds (Tr. at 290). According to Dr. Chernoff, a body mass index of 30 indicated obesity, 40 indicated morbid obesity, and 50 was "huge" or "in the range of enormous." (Tr. at 290).

42

in the lungs and the rest of the body resulting in shortness of
breath and difficulty lying in bed (Tr. at 295).

According to Dr. Chernoff, plaintiff suffered from
congestive cardiomyopathy or dilated cardiomyopathy which is a
disease of the ventricles that reduces the heart's ability to
contract, which is what ejection fraction measures (Tr. at 296).
Plaintiff's ejection fraction was 20-25 which was "very bad"
(normal is 55 to 70) (Tr. at 296). McKarnin's massive obesity
made his dilated cardiomyopathy "much worse because he's got to
hoist so much more mass around." (Tr. at 297).

Dr. Chernoff testified that plaintiff was "morbidly
restricted in his activities." (Tr. at 297). His residual
functional capacity was sedentary or less and he could stand or
walk less than two hours per day. Dr. Chernoff opined plaintiff
could lift 20 pounds on occasion, but less than ten pounds on a
regular basis. He suspected plaintiff could sit for six hours,
but he could not use foot controls; could rarely stoop, squat, or
climb steps; could not kneel, crawl, or climb a ladder; and must
avoid extremes of heat, cold, fumes, and vibration. Finally, Dr.
Chernoff stated, "I don't know if this man is capable of working
at all." (Tr. at 297).

Dr. Chernoff testified he did not believe plaintiff's
condition had changed since May 4, 2001. He noted plaintiff had
shown a "little tiny bit" of improvement in July 2000 when he

43

began his medications, but since then his condition had been
fairly stable (Tr. at 298). Although plaintiff's condition would
probably improve if he were to lose weight, the only option for
him would be to undergo bariatric surgery and plaintiff would not
be a candidate. Dr. Chernoff further stated that "diets,
universally, don't work" and that less than one percent of any
diet program will show effect in one year (Tr. at 298).

Later in the hearing, while discussing a comment made by Dr.
Franks in a consultative report wherein he expressed doubts as to
whether plaintiff was capable of working due to his heart
condition, Dr. Chernoff reiterated he was not sure plaintiff
could do anything in the way of employment (Tr. at 299-300).

Dr. Chernoff also testified that he disagreed with Dr.
Franks's statement that it was medically reasonable due to his
pedal edema for plaintiff to frequently elevate his feet to
waist-high to relieve pain and swelling. According to Dr.
Chernoff if a person had edema and his legs were swollen, it was
not a good idea to transfer that edema to his lungs by lying down
(Tr. at 301). Dr. Chernoff did agree with Dr. Franks's
conclusion that plaintiff would need to lie down several times a
day at unpredictable times because of the combination of his
impairments (Tr. at 301).

Although Dr. Chernoff first testified he did not believe
plaintiff technically met any of the Commissioner's listings

44

(although, according to Dr. Chernoff, "he comes pretty close"), he later testified he "equaled" cardiac listing 4.02B considering his massive obesity (Tr. at 297, 301-304). Specifically Dr. Chernoff testified that plaintiff had an ejection fraction of 30 or less, as required by part B of the listing, and additionally was unable to perform an exercise test as described under B1 due to his obesity, which was the point of equivalency, according to Dr. Chernoff. Plaintiff's condition resulted in marked limitation of physical activity demonstrated by fatigue and palpitations (Tr. at 301-304).

**4. Vocational expert testimony.**

Vocational expert Lisa Keene testified at the request of the Administrative Law Judge. The ALJ asked the vocational expert to consider a hypothetical claimant with a variety of impairments which when combined restricted him to work that would not require him to lift/carry objects in excess of 20 pounds occasionally and five to ten pounds frequently. Further, the individual would need an opportunity to work in a climate-controlled environment and avoid fumes and industrial pollutants. The person should also be given the opportunity to get up and move about occasionally (Tr. at 320-321).

The vocational expert testified that such a person would be unable to perform plaintiff's past relevant work but could perform sedentary work as a surveillance system monitor, an

45

information clerk, or a cashier (Tr. at 322). If, however, the hypothetical person had to miss work "two or three or four or more" days per month, he would be unable to maintain any work in the national economy (Tr. at 322). If the person's concentration, persistence, and pace were diminished to the extent that he would be unable to perform his work on a timely and accurate basis, maintain a production schedule, or be able to adequately follow and remember job instructions for any reason, he would be unable to maintain any employment (Tr. at 323).

The vocational expert, in response to a question by plaintiff's attorney, testified that an individual who needed to lie down several times throughout the workday at unpredictable times could not work, nor could an individual who could stand or walk less than two hours in an eight-hour day maintain full-time employment. However, the vocational expert then testified that the jobs she identified were sit/stand option jobs and such an individual could perform those jobs, presumably by sitting more than the six hours and thus standing less than two hours (Tr. at 324).

## V.  *FINDINGS OF THE ALJ*

On July 29, 2005, Administrative Law Judge Jack Reed entered his opinion finding plaintiff not disabled from his alleged onset date through April 23, 2004, but finding him disabled as of April 23, 2004 (his 50th birthday) through June 19, 2005 (the date of

46

his death) (Tr. at 275-285).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 277).

Step two.  Plaintiff suffered from dilated cardiomyopathy and atrial fibrillation, morbid obesity, non-insulin dependent diabetes mellitus, and history of testicular cancer with surgery, impairments that were severe within the meaning of the Regulations (Tr. at 278).

Step three.  Plaintiff's impairments did not meet or equal a listed impairment (Tr. at 278).  Although the medical expert "opined that the combination of obesity and cardiomyopathy might 'equal' Listing 4.02, [f]irst, Dr. Chernoff is neither a treating nor examining physician, [n]ext, he failed to note that the LVEF [left ventricle ejection fraction] had risen significantly between July 5 and July 29, 2000 and additional improvement possibly occurred, in view of the remaining improvement after July 2000.  Furthermore, the office notes fail to reveal significant cardiovascular dysfunction both a[t] rest and with moderate exertion." (Tr. at 278).

Step four.  Plaintiff retained the residual functional capacity to lift 20 pounds occasionally and five to ten pounds frequently, he needed climate controls with avoidance of fumes and pollutants, and he could work in a seated position with occasional standing as needed (Tr. at 282).  With this residual

47

functional capacity, plaintiff could not return to his past relevant work (Tr. at 282).

Step five. Plaintiff was capable of working as a surveillance systems monitor, an information clerk, or a cashier, jobs available in significant numbers (Tr. at 283).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

48

unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is not supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> While the more recent medical records continued to suggest some medical impairments that could reasonably be expected to cause some aches, pain, fatigue, etc., they were not consistent with the level of impairment alleged by the claimant. Between January 2003 and August 2004, clinical examinations revealed very little in the way of abnormalities. Irregular heart beat continued, but there were no persistent murmurs, gallops, or clicks. There were no persistent rhonchi, rales, or wheezes. The chest was clear to auscultation. No cyanosis or clubbing was appreciated. Edema was no more than trace and was non-pitting. No neurological abnormalities, consistent with

49

peripheral neuropathy, were reported.  In August 2004, the claimant complained of recent onset of back (kidney) pain and dizziness.  He was found to have kidney/balder [sic] dysfunction for which he underwent hospitalization in September 2004.  He also began to experience other problems with his diabetes.  He had to stop taking diuretics.

Despite the claimant's testimony at the initial hearing in January 2003 as to excess day-time sleeping, there only one mention of hypersomnolence in the medical record, January 6, 2003.  At that time, the claimant declined a sleep apnea study.  As noted previously, there were no echocardiograms after July 2000.  There were no stress tests after November 2000.  The claimant was not on insulin prior to August 2004.  There were no emergency room visits, let alone hospitalizations, between May 2001 and September 2004. Between January 2003 and [A]ugust 2004, there were few office visits and little laboratory testing.  Actually the level of treatment was greater between May 2000 and May 2001 (while the claimant was still working and prior to the alleged disability onset date), than it was between May 2001 and August 2004. The level of treatment between May 2001 and August 2004 is not consistent with the allegations of disabling symptomatology.

As to daily activities, they were reduced significantly after May 2001.  This is supportive of the claimant's allegations.

On the other hand, the claimant worked for over a year despite his impairments.  If anything, the objective record suggests that the impairments were much improved in My 2001, when compare[d] to May 2000.  While the claimant did miss a significant amount of work in May 2000 – May 2001, a treating physician reported on April 20, 2001 that the claimant was quite distressed regarding the fact that his work was terminating his job position or he would have to go back out into the field for a more strenuous job.  While a supervisor in July 2001 stated that the claimant could not fulfill his duties 100%, he cited strenuous activities such as asphalt patching, working with crews, operating equipment, and snow plowing.  In March 2005, it was reported that the claimant left his job due to "personal reasons".

Despite his allegations at the hearings that he needed to elevate his legs when sitting, in May 2001, the claimant stated that he had "no trouble" sitting.

50

* * * * *

Throughout the period in question, the claimant was overweight.
Numerous treating and examining physicians recommended weight
loss. Therefore, since the claimant failed to fully comply with
the recommendations of his own treating sources, the
Administrative Law Judge can only assume that he did not consider
the impairments as severe as alleged.  Actions speak louder than
words.

(Tr. at 279-280).

1.   **PRIOR WORK RECORD**

Plaintiff's prior work record establishes that he had an

excellent employment history with continually rising wages until

his alleged onset date.  This factor supports a finding that

plaintiff's allegations are credible.

2.   **DAILY ACTIVITIES**

The ALJ found that plaintiff's limited daily activities

supported plaintiff's allegations.

3.   **DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS**

Plaintiff reported that he showered only once or twice a

week because raising his arms in the shower caused chest pain and

palpitations requiring rest and nitroglycerin.  Shortly after his

alleged onset date, Dr. Kimball assessed fatigue and presyncope

(lightheadedness).  Dr. Kimball noted his surprise that plaintiff

was in regular rhythm due to his murmur, enlarged heart,

congestive heart failure, and other medical conditions.  In

January 2002, Dr. Kimball assessed congestive heart failure and

51

dilated cardiomyopathy, and he noted that plaintiff's condition was permanent. In May 2002, plaintiff continued to experience shortness of breath on exertion as well as at rest. In September 2002, during an appointment with Dr. Franks it was noted that plaintiff suffered from swollen feet which caused pain when he tried to walk. Plaintiff continued to have increased floaters and light sensitivity, and he suffered from general fatigue. Dr. Dahl noted progressive daytime sleepiness. He assessed sleep apnea and an irregular heart rhythm. In January 2003, Dr. Franks noted that plaintiff had no problem sitting except when he did he fell asleep. Plaintiff had an irregular heart beat and was diagnosed with cardiomyopathy, congestive heart failure, atrial fibrillation, diabetes, renal insufficiency, and sleep apnea.

The record is consistent that plaintiff suffered from severe symptoms whether he exerted himself or whether he rested. The medical records provide medical diagnoses which support plaintiff's symptoms. This factor supports a finding that plaintiff's allegations of disability are credible.

### 4.  *PRECIPITATING AND AGGRAVATING FACTORS*

As mentioned above, the record establishes that plaintiff experienced symptoms whether at rest or upon any exertion.

### 5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff's medication was constantly started, stopped, and changed. His symptoms became progressively worse throughout this

52

record indicating that his symptoms were not well controlled.

## 6. FUNCTIONAL RESTRICTIONS

Plaintiff's treating physician found that he needed to elevate his feet frequently at least to waist height to relieve pain and swelling. The medical records are replete with findings of peripheral edema and nonpitting edema, and that supports the recommendation that plaintiff elevate his legs frequently and lie down during the day. Plaintiff's treating physician and the medical expert found that plaintiff's impairments as well as the side effects of his medication require him to lie down several times throughout the day at unpredictable times. The medical records are consistent in plaintiff's complaints of fatigue, drowsiness, falling asleep while sitting during the day. The medical records support this finding. This factor supports a finding that plaintiff's allegations are credible.

## B. CREDIBILITY CONCLUSION

In addition to the above findings, I point out a few additional observations. In finding plaintiff not credible, the ALJ noted that plaintiff went to the doctor a lot more while he was working. The ALJ did not even ask plaintiff at the hearing whether plaintiff continued to have health insurance after his termination or whether a lack of health insurance had any affect on his ability to seek medical treatment. The medical records clearly indicate that plaintiff's condition was getting

progressively worse; therefore, any assumption by the ALJ that plaintiff's less frequent doctor appointments were a result of an improved condition is not supported by the evidence.

The ALJ also relied on his own assumption that plaintiff did not try to lose weight and stated that plaintiff "failed to fully comply with the recommendations of his own treating sources" to lose weight. This reliance is unfounded. The medical records establish that plaintiff weighed in excess of 350 pounds and could not be weighed on medical scales because his weight exceeded the limits on the scales. The evidence also establishes that plaintiff was indeed losing weight as he had to keep drilling more holes in his belts to make them tighter. The fact that scales could not measure the plaintiff's weight is completely irrelevant when the other evidence establishes that plaintiff's waist was getting smaller due to his efforts to lose weight. In addition, the medical expert testified that in general diets do not work, and that plaintiff's other impairments prevented exercise.

The ALJ relied on plaintiff's allegations to his doctor that he had no problem sitting; however, the ALJ failed to note that plaintiff fell asleep when he sat. Clearly one cannot perform substantial gainful activity while sleeping. The medical records establish that plaintiff's impairments and the side effects from his medication cause daytime drowsiness.

54

The ALJ discredited his own medical expert because he is not a treating physician.  The ALJ stated that the medical expert "failed to note that the LVEF (left ventricle ejection fraction) had risen significantly between July 5 and July 28, 2000, and additional improvement possibly occurred"[57].  The significant rising of plaintiff's ejection fraction went from a listing level ejection fraction to barely above a listing level ejection fraction[58].  Plaintiff's ejection fraction was never measured higher than 30 to 35%, with normal being 55 to 70%.  The ALJ's assumption that plaintiff's ejection fraction continued to improve is based on no evidence at all and, given the fact that plaintiff died from his impairment, seems all the more illogical.

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff's allegations of disabling symptoms are not credible.

## VII. FIFTH STEP OF THE SEQUENTIAL ANALYSIS

The ALJ found at the fifth step of the sequential analysis that plaintiff was able to perform other jobs in significant

---

[57]In addition to this quote, the ALJ stated in footnote one that "considering the quick improvement in July 2000 and the continued improvement as reflected in the remaining objective medical evidence, the LVEF probably increased even further." (Tr. at 279).

[58]The vocational expert described this as "a little tiny bit of improvement."

55

numbers in the national economy.  However, the ALJ relied on a hypothetical question to the vocational expert which did not include plaintiff's need to lie down multiple times during the day.  A hypothetical question posed to a vocational expert must include all credible impairments and limitations.  <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006).  Because in this case the ALJ's hypothetical did not include the requirement that plaintiff be able to lie down periodically during the day, the ALJ erred in relying on that testimony.  Rather, the vocational expert testified that a person who needs to lie down periodically during the day could perform no substantial gainful activity.

Because the substantial evidence in the record as a whole establishes that plaintiff needed to lie down periodically during the day, and because the vocational expert testified that such a person is not employable, the ALJ erred in finding plaintiff not disabled.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff was not disabled from May 1, 2001, to April 23, 2004.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted.  It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.


                                            /s/ Robert E. Larsen
                                        ROBERT E. LARSEN
                                        United States Magistrate Judge

Kansas City, Missouri
March 4, 2008

Case 4:07-cv-00071-REL   Document 20   Filed 03/04/08   Page 57 of 57